IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2019 Session

## STATE OF TENNESSEE v. DARRYL RENE MORGAN

**Appeal from the Criminal Court for Knox County**
**No. 111397   G. Scott Green, Judge**

_____

### No. E2018-00916-CCA-R3-CD
_____

The State of Tennessee appeals the Knox County Criminal Court's order granting the Defendant's motion to suppress, which resulted in the dismissal of the case. On appeal, the State contends that the trial court erred because the warrantless search of the Defendant was conducted pursuant to probable cause and exigent circumstances. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment if the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. JAMES CURWOOD WITT, JR., J., filed a dissenting opinion.

Mark Stephens, District Public Defender; Jonathan Harwell and Chloe Akers, Assistant District Public Defenders, Knoxville, Tennessee, for the appellant, Darryl Rene Morgan.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; Hector Sanchez and Brittany Sims, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to a December 10, 2015 traffic stop of a white Chevrolet Avalanche truck, which the Defendant drove but did not own. The Defendant was detained while a police dog and police officers searched the Avalanche. The Defendant was initially frisked for weapons, but none were found. Later during the stop, the Defendant was searched, and an officer retrieved marijuana from the Defendant's pants pocket. The Defendant was arrested, and heroin was discovered during a body cavity search at the jail.

The Defendant was indicted for possession with the intent to sell fifteen grams or less of heroin within 1000 feet of a childcare agency, possession with the intent to deliver fifteen grams or less of heroin within 1000 feet of a childcare agency, introduction of drugs into a penal institution, and misdemeanor possession of marijuana. *See* T.C.A. §§ 39-17-417 (2014) (possession of fifteen grams or less of heroin with intent to sell and deliver), 39-17-432 (2014) (drug-free school zone), 39-16-201 (2014) (introduction of drugs into a penal institution), 39-17-418 (2014) (amended 2016, 2018) (misdemeanor possession of marijuana). The Defendant filed a motion to suppress the marijuana, arguing that the officer lacked probable cause and exigent circumstances to search the Defendant during the traffic stop.

At the suppression hearing, Knoxville Police Investigator Phil Jinks testified that he had investigated an overdose death about one month before the traffic stop. Investigator Jinks stated that he reviewed a video recording from a convenience store surveillance camera related to the overdose and that the recording showed the victim speaking with someone who drove a white Avalanche. Investigator Jinks said that on the same day he reviewed the recording, he saw a white Avalanche parked at an apartment complex across the street from the store. He stated that he thought the Avalanche was the one he saw in the recording and that he noted the license plate number. He said that he conducted surveillance on the Avalanche for "quite some time" but never saw anyone approach it.

Investigator Jinks testified that he saw the Avalanche parked at a motel on December 10, 2015, and that he verified it was the same Avalanche he had seen at the apartment complex about one month previously. Investigator Jinks stated that he contacted other officers in the area and that he and the officers conducted surveillance on the Avalanche for several hours. Investigator Jinks said that he ended the surveillance to work on another matter and that the Avalanche was gone when he returned.

Investigator Jinks testified that after he returned, he resumed his surveillance and parked nearby waiting for the Avalanche to return. Investigator Jinks said that he saw the Avalanche park at a nearby convenience store. Investigator Jinks stated that he saw the Defendant get out of the Avalanche, walk inside the store, leave the store, and return to the Avalanche. Investigator Jinks said that the Avalanche drove past his patrol car and that he noticed an object partially covered the license plate.

Investigator Jinks stated that he called Officer Marrero, a K-9 officer, and instructed him to conduct a traffic stop. Investigator Jinks said that he did not conduct the traffic stop because he was in plain clothes and driving an unmarked patrol car. Investigator Jinks testified that he parked behind Officer Marrero's patrol car and that he

- 2 -

stayed for the duration of the stop. A video recording from Officer Marrero's patrol car was received as an exhibit.

In the recording, the Avalanche stopped on the right side of a one-way street at 15:03:32. The last digit of the license plate was obstructed from view. Officer Marrero approached the driver's window at 15:03:48 and stated that he stopped the Defendant because the license plate was obstructed. The Defendant said he was unaware the license plate was obstructed, and Officer Marrero responded, "Step back here and see what I'm talking about." The Defendant got out of the Avalanche, left the driver's door open, and walked to the rear of the truck with Officer Marrero at 15:04:11. Officer Marrero showed the Defendant the license plate and asked for the Defendant's driver's license. Officer Marrero asked the Defendant whether he owned the Avalanche, and the Defendant stated that it belonged to a friend. Another officer, who was later identified as Investigator Holmes, walked to the front of Officer Marrero's patrol car.

Officer Marrero instructed the Defendant to walk to the rear right side of the truck, and Investigator Jinks walked into the camera's view. Investigator Jinks asked the Defendant whether he possessed weapons, and the Defendant said he did not. The Defendant spread his arms, and Investigator Jinks frisked the Defendant for weapons at 15:04:36. As Investigator Jinks frisked the Defendant, Officer Marrero handed the Defendant's driver's license to Investigator Holmes. An unintelligible conversation occurred between Investigator Jinks and the Defendant. Officer Marrero walked out of the camera's view and reappeared with a police dog. The police dog did not alert to or interact with the Defendant. The frisk for weapons ended at 15:05:24.

Investigator Jinks instructed the Defendant to sit on the curb between the patrol car and the Avalanche. Investigator Jinks briefly stood in front of the patrol car, and Investigator Holmes and the Defendant walked out of the camera's view. The Defendant asked an unintelligible question, and one of the officers responded, "We'll explain everything in just a second, okay?" Officer Marrero approached the Avalanche with the police dog at 15:05:27. The police dog briefly jumped and placed his paws on the tailgate, while the dog's hind legs remained on the ground. Officer Marrero and the police dog walked to the open driver's door. Investigator Jinks walked to the right of the patrol car and out of the camera's view. The police dog briefly stood in the opening of the driver's door, walked away, and circled back around to Officer Marrero. Officer Marrero moved into the opening of the door, and the police dog stood in the opening. Officer Marrero's left hand entered the Avalanche, and the police dog jumped inside. Investigator Holmes walked into the camera's view and stood between the Avalanche and the patrol car. The recording ended while the police dog was inside the Avalanche.

Investigator Jinks testified that he smelled the odor of raw marijuana coming from inside the Avalanche and that after the Defendant got out of the truck, he recognized the Defendant from a previous investigation. Investigator Jinks stated that several months before the incident, he executed a search warrant at a home and found heroin and a firearm, that the Defendant was arrested, and that the Defendant had been released on bond for this incident at the time of the traffic stop in the present case. Investigator Jinks said that he smelled marijuana when he spoke to the Defendant and that he had probable cause to search the Avalanche because he smelled marijuana coming from the truck. Investigator Jinks said that he conducted a "pat down" on the Defendant but did not conduct a search. Investigator Jinks stated that Investigator Holmes searched the Defendant while Investigator Jinks searched the Avalanche. Investigator Jinks stated the Defendant was arrested after marijuana was found in his pants pocket. Investigator Jinks said that he did not find marijuana or any other controlled substance in the Avalanche.

Upon questioning from the trial court, Investigator Jinks testified that he did not see the Defendant place the marijuana from his pants pocket on the hood of the patrol car and that the search was described to him after the Defendant was arrested. Investigator Jinks stated that the Defendant was the only person in the Avalanche and that he saw a "piece of paper wad[d]ed up with marijuana in it." Investigator Jinks said he and Investigator Holmes discussed the Defendant's smelling like marijuana before the search, that they agreed the Defendant "probably" had some marijuana in his pants pocket, and that Investigator Holmes searched the Defendant "or asked him to produce the items." Investigator Jinks said that heroin was found during the Defendant's body cavity search at the jail.

On cross-examination, Investigator Jinks testified that he thought the Avalanche was connected with a heroin transaction which occurred before the traffic stop. When Investigator Jinks was asked whether the stop was "essentially a pretext – you were not actually investigating the license plate, you were investigating for some other purpose, but you believed he had violated the laws of the road[,]" Investigator Jinks responded, "That's correct, yes." Investigator Jinks said four or five officers, three marked patrol cars, and one unmarked patrol car were at the scene.

Investigator Jinks testified that Officer Marrero walked his police dog to the Avalanche and that the dog went inside. Investigator Jinks stated that he searched the Avalanche and that the Defendant sat "on the side of the road." Investigator Jinks said that the Defendant was briefly detained and was not free to leave "based on the totality of the circumstances with the smell of marijuana in the truck and on his person." Investigator Jinks did not recall what he said to the Defendant during the stop. Investigator Jinks acknowledged that, at the preliminary hearing, he testified that he

- 4 -

asked the Defendant whether the Defendant possessed marijuana and that the Defendant denied possessing it.

Investigator Jinks testified that, after he searched the Avalanche, he saw the Defendant's possessions on the hood of a patrol car, including a piece of paper containing marijuana. On redirect examination, Investigator Jinks testified that he smelled marijuana in the Avalanche and coming from the Defendant before the police dog signaled it detected drugs.

Knoxville Police Investigator John Holmes testified that Investigator Jinks had investigated an overdose and that the investigation involved the Avalanche. Investigator Holmes stated that Investigator Jinks saw the Avalanche parked at a motel on the day of the traffic stop and that he helped Investigator Jinks conduct surveillance. Investigator Holmes said that he and Investigator Jinks later saw the Avalanche parked at a convenience store.

Investigator Holmes testified that he first encountered the Defendant after the Defendant was escorted to the back of the Avalanche during the traffic stop and that he smelled marijuana coming from the truck and the Defendant. Investigator Holmes stated that he searched the Defendant because he smelled marijuana, that he asked the Defendant if "he had anything on his person," and that the Defendant started pulling items from the Defendant's pants pockets. Investigator Holmes said that the Defendant pulled out a white piece of paper, and that the Defendant immediately pushed the paper into his pocket, and that "at that point I went into his pocket and retrieved that piece of paper[.]"

Upon questioning by the trial court, Investigator Holmes testified that he found a few grams of marijuana, that the marijuana was contained in the piece of paper but was not "rolled," and that he did not recall if the marijuana was in the Defendant's right or left pants pocket. The following exchange took place between the court and Investigator Holmes:

THE COURT: All right. What words, if any, did you say to him prior to him – other than saying ["]do you have anything else on your person,["] did you say anything else to him or give him any other directive?
THE WITNESS: Not that I recall. No, sir.
THE COURT: And in response to the statement ["]do you have anything else on your person["], you're saying that's when he started pulling stuff out of –
THE WITNESS: Yes.
THE COURT: – his pockets?
THE WITNESS: Yes, sir.

THE COURT: Including the white piece of paper that he put back into his pocket?

THE WITNESS: He pulled it out partially like it was an accidental removal from the pocket. When he did so, he stuffed it back into his pocket. And I said, "[H]ey, what's that[?]" and went to retrieve it.

On cross-examination, Investigator Holmes testified that he found one or two grams of raw marijuana. He stated that he smelled marijuana after walking toward the Avalanche and did not recall if the windows of the Avalanche were down or if he walked to the driver's door. Investigator Holmes said that the driver's door was open, that a police dog indicated that it detected the presence of drugs, and that he smelled marijuana "at some point" when the door was open. Investigator Holmes stated that he smelled marijuana when he spoke with the Defendant and that he did not recall if the Defendant was handcuffed during the conversation. Investigator Holmes said that, based on his experience and training, a person would be able to smell about one gram of marijuana wrapped in a sheet of paper in an individual's pants pocket. Investigator Holmes stated that he recognized the Defendant from a previous encounter. Investigator Holmes did not recall the Defendant's answer when he asked if the Defendant had "anything else" but said that the Defendant removed items from his pants pockets.

Investigator Holmes testified that he, Investigator Jinks, Officer Marrero, and Officer Park were present during the traffic stop. Investigator Holmes agreed that he kept the Defendant in sight during the stop. When asked, "You weren't concerned [the Defendant] was able to get away," Investigator Holmes responded, "I think at one point [the Defendant] was sitting on the curb, but I don't recall." A video recording taken from Officer Park's patrol car was received as an exhibit and was played for the trial court without audio due to an equipment malfunction.

In the recording, Officer Park's patrol car parked behind Officer Marrero's patrol car at 15:07:43. The Defendant sat on the curb to the right of Officer Marrero's patrol car and appeared to be speaking with someone, although the person was not in the camera's view. The Avalanche was not initially visible in the recording. Officer Park got out of his patrol car, walked by the left side of Officer Marrero's patrol car, and walked out of the camera's view.

At 15:08:05, Investigator Jinks walked into the camera's view and opened the Avalanche's front passenger door. At 15:08:13, Investigator Holmes walked into the camera's view and stood by the Defendant's left side. The Defendant, who was not handcuffed, stood and walked to the front of Officer Park's patrol car at 15:08:16, and Investigator Holmes and Officer Park followed. Before approaching the hood of Officer Park's patrol car, Investigator Holmes placed his right hand on the Defendant's back, and

- 6 -

the Defendant removed what appeared to be a wallet, a piece of white cloth, and an unidentifiable item from the pocket of the Defendant's hooded sweatshirt. The Defendant placed the items on the hood of Officer Park's patrol car at 15:08:25. The Defendant placed his hands inside of his front pants pockets, removed cash and chapstick, and placed the items on the hood. The Defendant removed more cash from his right front pants pocket and placed it on the hood. The Defendant placed his hands in his back pants pockets and did not remove any items.

Officer Holmes lifted the Defendant's black sweatshirt, which covered the top of the Defendant's jeans. The Defendant started to retrieve a white object from a smaller front pants pocket at 15:08:41. The Defendant placed the white object back in his pocket, retrieved cash from the same pocket, handed the cash to Investigator Holmes, and Investigator Holmes placed the cash on the hood. The Defendant placed his hands in the air at 15:08:51. When the Defendant had his hands in the air and his back to Investigator Holmes, Investigator Holmes placed his right hand in the Defendant's right front pocket and retrieved a white piece of paper at 15:08:57. Investigator Holmes searched the Defendant's left front pocket and did not remove any items. Investigator Holmes placed his hand in the Defendant's right front pocket, retrieved a lighter, and placed the lighter on the hood. The Defendant spread his legs, and Investigator Holmes used his hands to search the remaining portions of the Defendant's pants. Investigator Park stood beside the Defendant for the duration of the search.

Investigator Holmes and the Defendant walked out of the camera's view at 15:09:50, and Officer Park walked out of view at 15:09:55. Investigator Holmes and Officer Park returned to the front of the patrol car and unfolded the piece of white paper at 15:10:11.

Investigator Holmes narrated the recording. He said it appeared he asked the Defendant to walk to Officer Park's patrol car, but he did not recall. Investigator Holmes said that the Defendant started to pull a piece of white paper from the Defendant's front pants pocket and that the Defendant pushed the paper back in his pocket. Investigator Holmes stated that he searched the Defendant with his hands and that he retrieved the paper from the Defendant's front pants pocket. Investigator Holmes said that he placed the Defendant in the back of the patrol car, that the doors automatically locked, and that did not think he placed the Defendant in handcuffs. Investigator Holmes stated that he returned to the hood of the patrol car, opened the paper, and found marijuana.

Investigator Holmes testified that he obtained the paper containing marijuana with his hand after he saw the Defendant push the paper back in his pocket. Investigator Holmes said that the search occurred after he smelled marijuana coming from the Defendant.

The trial court granted the Defendant's motion to suppress the marijuana. The court credited the testimony of Investigator Jinks and Investigator Holmes. The court determined that Investigator Holmes smelled marijuana coming from the Defendant, that a "pat down search" was conducted, and that Investigator Holmes found raw marijuana during a subsequent search of the Defendant. The court found that heroin was discovered after the Defendant was arrested for possession of marijuana and taken to the jail. The court determined that probable cause to search the Defendant existed based upon the smell of marijuana coming from the Defendant but that the State did not prove that exigent circumstances supported the warrantless search of the Defendant. The court noted that *State v. Reginald Allan Gillespie*, No. 03C01-9706-CR-00222, 1999 WL 391560 (Tenn. Crim. App. June 19, 1999), required the existence of probable cause and exigent circumstances to support a warrantless search of a person after smelling marijuana on the person. The court's granting of the Defendant's motion to suppress resulted in an effective dismissal of the case and this appeal followed. *See* T.R.A.P. 3(c).

The State contends that the trial court erred by granting the Defendant's motion to suppress because the evidence preponderates against the court's determining that the State failed to prove exigent circumstances. The State argues that a search of the Defendant was necessary to: (1) thwart escape because the Defendant was "standing on the side of the road and was not handcuffed," and (2) prevent the imminent destruction of the marijuana because the Defendant could have disposed of it in the presence of the officers and because he had attempted to hide it. The Defendant responds that the court properly granted his motion to suppress because the State failed to prove that exigent circumstances supported the warrantless search. We agree with the Defendant.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

Our federal and Tennessee constitutions prohibit unreasonable searches and seizures and provide generally that warrantless searches and seizures are presumed unreasonable and that evidence recovered as a result of warrantless searches and seizures is subject to suppression. *See* U.S. Const. amend IV; Tenn. Const. art. I, § 7; *see also Yeargan*, 958 S.W.2d at 629. As a general principle, the police cannot conduct a search without obtaining a warrant. *R.D.S. v. State*, 245 S.W.3d 356, 365 (Tenn. 2008) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). However, our courts have identified narrow exceptions to the warrant requirement. *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)).

> "These exceptions include searches and seizures conducted incident to a lawful arrest, those yielding contraband in 'plain view,' those in the 'hot pursuit' of a fleeing criminal, those limited to a 'stop and frisk' based on reasonable suspicion of criminal activity, those based on probable cause in the presence of exigent circumstances, and those based on consent."

*State v. Day*, 263 S.W.3d 891, 909 n.9 (Tenn. 2008) (citing *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005); *Bartram*, 925 S.W.2d at 230 n.2; *Coolidge*, 403 U.S. at 454-55).

Our supreme court has also recognized the automobile exception to the warrant requirement. The automobile exception "permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband." *See State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009) (holding that the automobile exception requires probable cause but does not require a separate finding of exigency). Unlike the automobile exception, a warrantless search of a person is permissible if both probable cause and exigent circumstances exist. *See State v. Shrum*, 643 S.W.2d 891, 893 (Tenn. 1982); *State v. Blakely*, 677 S.W.2d 12, 16 (Tenn. Crim. App. 1983). "Probable cause generally requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." *State v. Williams*, 193 S.W.3d 502, 507 (Tenn. 2006). This court has concluded that the smell of marijuana coming from a defendant gives police officers probable cause to conduct a search. *See State v. Hughes*, 544 S.W.2d 99, 101 (Tenn. 1976); *Hicks v. State*, 534 S.W.2d 872, 874 (Tenn. Crim. App. 1975); *State v. Frederic A. Crosby*, No. W2013-02610-CCA-R3-CD, 2014 WL 4415924, at *8 (Tenn. Crim. App. Sept. 9, 2014); *State v. James C. Leveye*, No. M2003-02543-CCA-R3-CD, 2005 WL 366892, at *3 (Tenn. Crim. App. Feb. 16, 2005); *State v. Reginald Allan Gillespie*, No. 03C01-9706-CR-00222, 1999 WL 391560, at *3 (Tenn. Crim. App. June 16, 1999), (*perm. app. denied*) (Tenn. Nov. 22, 1999). "[N]o amount of probable cause can justify a warrantless search or seizure [of a person], absent exigent circumstances," when none of the additional exceptions to the warrant requirement apply. *Frederic A. Crosby*, 2014 WL 4415924, at *7 (internal citations omitted); *see Reginald Allan Gillespie*, 1999 WL 391560, at *3; *James C. Leveye*, 2005 WL 366892, at *3. We note

that this case does not involve a search incident to an arrest, plain view, hot pursuit, stop and frisk, or consent. The only issue in this case is whether probable cause in the presence of exigent circumstances supported the warrantless search of the Defendant. *See Day*, 263 S.W.3d at 909 n.9; *Cox*, 171 S.W.3d at 179; *see also Coolidge*, 403 U.S. at 454-55).

Exigent circumstances dispense with the warrant requirement when "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). Exigent circumstances arise "only where the State has shown that the search is imperative." *Meeks*, 262 S.W.3d at 723. Our supreme court has stated that "the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." *Id*. Mere speculation, however, is insufficient to establish exigency. *Id.* at 723-24. The State "must rely upon specific and articulable facts and the reasonable inferences drawn from them." *Id.* at 724. "The circumstances are viewed from an objective perspective," and the officer's subjective intent is irrelevant. *Id*.

> Although this list is not exhaustive, [our supreme court has] held that exigent circumstances justifying a warrantless search may exist: (1) when officers are in hot pursuit of a suspect, (2) when immediate police action is needed to thwart the escape of a suspect, (3) when immediate police action is necessary to prevent the destruction of evidence, (4) when the suspect presents an immediate threat to police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury.

*State v. Hutchinson*, 482 S.W.3d 893, 916 (Tenn. 2016). (internal citations omitted).

As a preliminary matter, both parties concede that probable cause supported a search of the Defendant because the credited testimony of Investigators Jinks and Holmes reflected that they smelled marijuana coming from the Defendant. *See Frederic A. Crosby*, 2014 WL 4415924, at \*8; *see also Reginald Allan Gillespie*, 1999 WL 391560, at \*3. Therefore, the only issue we must determine is whether the warrantless search of the Defendant was also supported by exigent circumstances.

We conclude that the trial court did not err by granting the Defendant's motion to suppress because the State failed to prove the existence of exigent circumstances. The record reflects that while the Defendant was frisked for weapons, Investigator Holmes, Investigator Jinks, Officer Marrero, and a police dog stood near the Defendant. We note

- 10 -

that the police dog did not signal that it detected drugs or interact with the Defendant. After the initial frisk for weapons, the Defendant sat on the curb between the Avalanche and Officer Marrero's patrol car. Investigator Jinks and Holmes stood near the Defendant when Officer Marrero approached the Avalanche with the police dog. Investigator Holmes stood near the Defendant while Investigator Jinks searched the Avalanche.

When Officer Park arrived at the scene, the Defendant was sitting on the curb in front of Officer Marrero's patrol car. Officer Park walked toward the Defendant and out of the camera's view. After a few seconds, the Defendant stood and walked toward Officer Park's patrol car. Investigator Holmes and Officer Park followed the Defendant, and Investigator Holmes placed his hand on the Defendant's back before approaching the patrol car. Investigator Homes testified that it appeared he asked the Defendant to walk to Officer Park's patrol car. While the Defendant removed items from his pockets, both Investigator Holmes and Officer Park stood beside the Defendant. The Defendant started to remove a white piece of paper from his smaller right pants pocket, pushed the paper back in the pocket, and removed cash instead. Investigator Holmes subsequently searched the Defendant, and the Defendant stood with his hands in the air. After the search ended and Investigator Holmes had removed the piece of paper containing marijuana from the Defendant's pants pocket, Investigator Holmes placed the Defendant in the backseat of Officer Park's locked patrol car.

The record reflects that the Defendant was the only person in the Avalanche when the traffic stop occurred and that four police officers and one police dog were present. When Investigator Holmes was asked, "You weren't concerned [the Defendant] was able to get away," he responded, "I think at one point [the Defendant] was sitting on the curb, but I don't recall." Neither Investigator Jinks nor Investigator Holmes testified that they were concerned the Defendant might escape and nothing in the recordings reflect that the Defendant might flee the scene.

Furthermore, no evidence shows that immediate police action was necessary to prevent the destruction of evidence. *See Hutchinson*, 482 S.W.3d at 916. The Defendant sat on the curb for most of the incident and was surrounded by one or two officers. When the Defendant approached Officer Park's patrol car, Investigator Holmes and Officer Park followed the Defendant. The Defendant was placed in Officer Park's locked patrol car after the warrantless search of the Defendant. No evidence shows that the Defendant attempted to place his hand in his pocket where the raw marijuana was found. Investigator Jinks stated that he and Investigator Holmes agreed the Defendant "probably" had some marijuana in his pants pocket, but no testimony reflects that the Defendant attempted to destroy the evidence or that the officers thought the Defendant

might destroy the evidence. The evidence does not preponderate against the the trial court's determination that exigent circumstances did not support the warrantless search.

In considering this issue, we have not overlooked the State's reliance on *Frederic A. Crosby*, 2014 WL 4415924, at *9, and *Reginald Allan Gillespie*, 1999 WL 391560, at *3. In both cases, this court found that both probable cause and exigent circumstances supported warrantless searches after officers smelled marijuana coming from the defendants. However, both cases are distinguishable from this case.

In *Frederic A. Crosby*, two police officers responded to a domestic dispute between the defendant and a woman in a parking lot. *Frederic A. Crosby*, 2014 WL 4415924, at *1. One officer spoke with the woman while the second officer, who spoke with the defendant, smelled marijuana coming from the defendant. *Id*. The officer asked the defendant if he possessed marijuana, and the defendant responded that he did not but that he had been around others who had been smoking marijuana. *Id*. The officer searched the defendant and found marijuana in the defendant's pants and jacket pockets. *Id*. This court determined that probable cause supported the search because the officer smelled marijuana coming from the defendant. *Id*. at *8. This court also concluded that exigent circumstances supported the warrantless search because the officer asked "about the origins of the odor of marijuana, alerting [the defendant] to the issue of drug detection." *Id*. at *9. The court determined that the officer could not have left to obtain a search warrant or requested another officer obtain warrant without risking the defendant's escaping or destroying evidence. *Id*.

In *Reginald Allan Gillespie*, a police officer drove his patrol car by the defendant and two other men standing on a sidewalk. *Reginald Allan Gillespie*, 1999 WL 391560, at *1. The patrol car's windows were down, and the officer smelled marijuana. The officer stopped the patrol car, walked toward the three men, and saw smoke around them. *Id*. The officer asked them where the marijuana was located, and none of the men responded. *Id*. The officer conducted a pat down search of the defendant, immediately recognized a "lump" in the defendant's left pants pocket, and removed a plastic bag containing a lighter, cash, and crack cocaine. *Id*. A second officer arrived, conducted a subsequent search of the Defendant, and found marijuana, a gun, and a loaded ammunition clip. *Id*. The Defendant filed a motion to suppress arguing that the initial pat down search of the Defendant was unconstitutional. *Id*. at *2. The court determined that the officer had reasonable suspicion to support an investigatory detention and that probable cause supported the search because the officer saw smoke and smelled marijuana. *Id*. at *3. This court, likewise, concluded that the search was supported by exigent circumstances because the Defendant could have escaped and had the ability to dispose of the drugs, even in the presence of the officer. *Id*.

Unlike *Frederic A. Crosby* and *Reginald Allan Gillespie*, the Defendant was the only person at the scene other than the four police officers and the police dog who responded to the traffic stop. For the majority of the incident, the Defendant sat on a curb between the Avalanche and Officer Marrero's patrol car, and at least one officer stood near the Defendant while he sat on the curb. When the Defendant walked toward Officer Park's patrol car, Investigator Holmes and Officer Park escorted the Defendant, and both officers stood near the Defendant when the Defendant removed items from his pockets. Officer Park stood beside the Defendant while Investigator Holmes searched the Defendant. After the search concluded, Investigator Holmes placed the Defendant in Officer Park's patrol car. The risk of the Defendant escaping or destroying evidence was very low, if not non-existent, given the number of police officers present at the scene. *See State v. Boyce Turner*, No. E2013-02304-CCA-R3-CD, 2014 WL 7427120, at *7 (Tenn. Crim. App. Dec. 30, 2014) (refusing to apply exigent circumstances exception in a blood draw case when there were "at least five Johnson City police officers who responded to the scene); *see also State v. James Dean Wells*, M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *5 (Tenn. Crim. App. Oct. 6, 2014) (upholding the trial court's finding that no exigency existed in a blood draw case when, among other things, "five officers were simultaneously investigating the incident"). One of the officers could have left the scene to obtain a search warrant without the Defendant's escaping or destroying evidence.

The State argued that the Defendant was notified to the issue of drug detection when the drug dog indicated that it detected drugs during the search of the Avalanche and that the warrantless search of the Defendant was necessary to prevent the destruction of the marijuana. However, Investigator Jinks and Investigator Holmes testified that they could not recall what they said to the Defendant during the incident other than that Investigator Holmes asked the Defendant whether "he had anything on his person." Furthermore, the record reflects that the Defendant did not own the Avalanche and that no drugs were found inside. The evidence does not show that the drug dog alerted to the Defendant. Therefore, the evidence fails to show that the Defendant was "alerted to the issue of drug detection" before the warrantless search of the Defendant. *See Frederic A. Crosby*, 2014 WL 4415924, at *9.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.


_____
ROBERT H. MONTGOMERY, JR., JUDGE

- 13 -